UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

| | |
|---|---|
| VERNON FINFROCK AND DEANNA FINFROCK, individually and on behalf of N.D. FINFROCK, a minor,<br><br>  Plaintiffs,<br><br>  v.<br><br>ANTHEM INSURANCE COMPANIES, INC. d/b/a ANTHEM BLUE CROSS BLUE SHIELD,<br><br>  Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)   CASE NO.: 3:12-CV-111-TLS<br>)<br>)<br>)<br>)<br>) |

**OPINION AND ORDER**

At issue in this lawsuit is whether the terms of the health benefit plan that was sponsored by Plaintiff Vernon Finfrock's employer authorized coverage for vision training services provided to Mr. Finfrock's minor child, N.D. Finfrock. Defendant Anthem Insurance Companies, Inc., who underwrote and administered the plan, denied coverage on grounds that vision services were specifically excluded under the language of the plan. The Plaintiffs assert that the vision training services were included in N.D.'s treatment plan for his diagnosed Pervasive Developmental Disorder and, as such, should have been covered. The Plaintiffs sued the Defendant in state court to recover the amounts they paid for N.D. to receive the vision services, and the Defendant removed the matter to this Court, invoking its original jurisdiction over actions brought by participants or beneficiaries to recover benefits under employee welfare benefit plans pursuant to 29 U.S.C. § 1132(e), the Employee Retirement and Income Security Act (ERISA). This matter is now before the Court on the Defendant's Motion for Summary Judgment [ECF No. 17], and Brief in Support [ECF No. 18], the Response to Motion for Summary Judgment [ECF No. 26], and the Defendant's Reply in Support [ECF No. 29].

**BACKGROUND**

A.  **The Health Benefit Plan**

In 2009, the Plaintiffs were covered under an ERISA-governed health benefit plan sponsored by Mr. Finfrock's employer, which was underwritten and administered by Anthem. The Health Certificate of Coverage (the Certificate) contained a Reservation of Discretionary Authority, which authorized the Defendant to "determine the administration of benefits and eligibility for participation in such a manner that has a rational relationship to the terms set forth herein . . . [with] complete discretion to determine the administration of your benefits." (Certificate at M-87, R. at 89, ECF No. 18-1 at 89.) This discretion included "the power to construe the Contract, to determine all questions arising under the Certificate and to make, establish and amend the rules, regulations and procedures with regard to the interpretation and administration of the provisions of this Certificate." (*Id.*)

The Certificate specifically "excluded from benefit consideration" services for "vision orthoptic training." (Certificate at M-44, M-47; R. at 46, 49.) The Certificate also contained the following provision governing coverage for treatment of Pervasive Developmental Disorders (PDD):

> Coverage is provided for the treatment of pervasive developmental disorders. Treatment is limited to services prescribed by your Physician in accordance with a treatment plan. Pervasive developmental disorder means a neurological condition, including Asperger's syndrome and autism, as defined in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association. Coverage for services will be provided as prescribed by the Member's treating Physician in accordance with a treatment plan. Any exclusion or limitation in this Certificate in conflict with the coverage described in this provision will not apply. Coverage for the treatment of pervasive developmental disorders will not be subject to dollar limits, Deductibles, Copayments or Coinsurance provisions that apply to a physical illness as covered under this Certificate.

(Certificate at M-31, R. at 33.)

**B.     N.D.'s Pervasive Developmental Disorder Diagnosis**

On March 17, 2009, Dr. Carol Luzzi, N.D.'s pediatrician, diagnosed N.D. as PDD/NOS. She referred him to Dr. Dan Fortenbacker for vision therapy. From November 3, 2009, to February 18, 2010, N.D. received vision therapy from Dr. Fortenbacker.

**C.     Claims for Coverage**

In November 2009, the Defendant denied N.D.'s claims in connection with his vision orthoptic training as a non-covered service or policy exclusion, citing the unambiguous exclusion of vision orthoptic training. On April 18, 2010, Mr. Finfrock initiated a first-level appeal, urging for coverage under the PDD Services provision of the Certificate. He provided a letter from Dr. Luzzi discussing N.D.'s medical history; Dr. Luzzi's treatment plan; Dr. Luzzi's Physician Orders for vision therapy; and correspondence from Dr. Fortenbacker to Dr. Luzzi concerning N.D.'s initial consultation, diagnosis, and recommended treatment. On April 22, the Defendant denied the appeal, noting that Dr. Fortenbacker's diagnosis was for convergence insufficiency.[1]

Mr. Finfrock urged the Defendant to reevaluate its decision on grounds that the services were covered as part of N.D.'s physician's treatment plan for a diagnosis of PDD. On June 8, 2010, the Defendant upheld the adverse decision on the following grounds:

> A letter from your son's pediatrician dated April 16, 2010 indicates that he is also diagnosed with "Autism Spectrum disorder (PDD expression)." In your appeal you are requesting that orthoptic vision training be covered under your health plan's

---

[1] A definition of convergence insufficiency provided by Mayo Clinic Staff on mayoclinic.com states that it occurs when a person's eyes do not turn inward properly while focusing on a nearby object. http://www.mayoclinic.com/health/convergence-insufficienty/DS01146, last visited August 30, 2012.

3

> guidelines for Pervasive Developmental Disorder Services, listed on page M-31, which state: "Coverage is provided for the treatment of pervasive developmental disorders. Treatment is limited to services prescribed by your Physician in accordance with a treatment plan. Pervasive developmental disorder means a neurological condition, including Asperger's syndrome and autism, as defined in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association. Coverage for services will be provided as prescribed by the Member's treating Physician in accordance with a treatment plan. Any exclusion or limitation in this Certificate in conflict with the coverage described in this provision will not apply. Coverage for the treatment of pervasive developmental disorders will not be subject to dollar limits, Deductibles, Copayments or Coinsurance provisions that are less favorable than the dollar limits, Deductibles, Copayments or Coinsurance provisions that apply to a physical illness as covered under this Certificate."
>
> As noted above, pervasive developmental disorder is defined in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-IVTR). Vision problems or vision disturbances are not listed as part of the DSM criteria for PDD. The National Institutes of Health, National Eye Institute Press Release on October 13, 2008 indicates that convergence insufficiency is a common childhood eye muscle coordination problem.
>
> Orthoptic training is not covered for your son. The treatment he is receiving is for eye muscle coordination. This is a common childhood problem and is not specific to PDD. Orthoptic training is not an accepted treatment for PDD as defined in DSM-IV-TR. Therefore, the denial has been upheld.

(R. at 175–76, ECF No. 18-2 at 24–25.)

On June 7, 2010, Mr. Finfrock initiated a second-level appeal. The Defendant invited N.D.'s parents to attend an Appeals Panel meeting and to provide additional evidence to the Panel. On August 10, 2010, the Defendant notified the Plaintiffs that it was upholding the denial of coverage:

> The Appeals Panel had a psychiatrist review the medical records provided for your appeal case. Our physician reviewer concluded that the most recent Diagnostic and Statistical Manual of Mental Disorders (DSM IV TR) does not list eye problems as criteria for Pervasive Developmental Disorder (PDD). In the information that was submitted there was no convincing documentation that the member's convergence insufficiency was part of his PDD. A Press Release 10-13-2008 from the National Institute of Health indicates that convergence insufficiency is a common childhood

>eye muscle coordination problem.
>
>Therefore, based on the . . . provisions found in your health plan document, your request for coverage for [vision orthoptic training] remains denied.

(R. at 182.)

On February 7, 2012, the Plaintiff sued the Defendants, and on March 26, they filed an Amended Complaint specifically invoking ERISA, 29 U.S.C. § 1132(a)(1)(B).

## ANALYSIS

When the administrator of a plan is vested with discretionary authority to interpret the plan's provisions and to determine eligibility for and entitlement to plan benefits, as the Defendant is here, the court "will only look to ensure that the [administrator's] decision 'has rational support in the record.' " *Speciale v. Blue Cross & Blue Shield Ass'n*, 538 F.3d 615, 621 (7th Cir. 2008) (quoting *Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 576 (7th Cir. 2006)). The court

>upholds the plan's decision as long as (1) it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, (2) the decision is based on a reasonable explanation of relevant plan documents, or (3) the administrator has based its decision on a consideration of the relevant factors that encompass the important aspects of the problem.

*Id.* (internal quotation marks omitted). Although review under this arbitrary and capricious standard "is not a rubber stamp and deference need not be abject," *Hackett v. Xerox Corp. Long–Term Disability Income Plan*, 315 F.3d 771, 774 (7th Cir. 2003), a court can "overturn the administrator's decision only where there is an absence of reasoning to support it," *Jackman Fin. Corp. v. Humana Ins. Co.*, 641 F.3d 860, 864 (7th Cir. 2011). "Put simply, an administrator's decision will not be overturned unless it is downright unreasonable." *Edwards v. Briggs &*

*Stratton Ret. Plan*, 639 F.3d 355, 360 (7th Cir. 2011) (quoting *Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 576 (7th Cir. 2006) (quoting *Sisto v. Ameritech Sickness & Accident Disability Benefit Plan*, 429 F.3d 698, 700 (7th Cir. 2005) (internal quotation marks omitted))).

The Plaintiffs argue that because Dr. Luzzi, N.D.'s treating physician, prescribed a treatment plan for his PDD that included vision orthoptic training, it is covered as a PDD service. The Defendant asserts that, although the services may have been prescribed, they were not prescribed *for the treatment of PDD* but, rather, for the treatment of a separate diagnosed ailment of convergence insufficiency. The Defendant contends that several levels of review, an examination of N.D.'s medical records and correspondence from his physicians, and consultation with a psychiatrist, revealed no documentation that his convergence insufficiency, a condition common to early childhood, was related to his PDD diagnosis. The Plaintiffs, in turn, argue that the Defendant only reached this conclusion by arbitrarily selecting facts that would support its conclusion, and ignoring or misstating information from N.D.'s physicians indicating that he needed vision therapy to treat his social and attentional problems in school which, they argue, clearly fall within the criteria and overall definition of PDD. Specifically, the Plaintiffs point to Dr. Luzzi's April 16, 2010, letter to the Defendant. In this letter, Dr. Luzzi stated that her treatment plan for N.D.'s Autism Spectrum Disorder included vision therapy intervention "to treat the core social deficits present as a result of this child's autism." (R. at 141, ECF No. 18-1 at 141.) The Plaintiffs also rely on statements found in Dr. Fortenbacher's October 23, 2009, correspondence to Dr. Luzzi. After Dr. Fortenbacher evaluated N.D., he wrote that N.D. presented with the following: 1. compound hyperopic astigmatism, right eye; simple myopic astigmatism, left eye; 2. convergence insufficiency; 3. oculomotor dysfunction; 4. high-

functioning ASD per history; and 5. ocular structures normal, no indication of ocular disease. Dr. Fortenbacher indicated that N.D.'s "condition of binocular dysfunction and oculomotor dysfunction is significant as it relates to his overall attention and concentration as well as abilities to participate in classroom activities as expected with his peers." (R. at 142, ECF No. 18-1 at 144.) On October 30, 2009, Dr. Fortenbacher wrote a letter to the Defendants stating that he had diagnosed N.D. with convergence insufficiency, secondary to PDD.

Turning to the language of the Certificate, it plainly states that services for vision orthoptic training are not covered. However, this exclusion does not apply if services are being provided for the treatment of PDD. (Certificate at M-31) ("Any exclusion or limitation in this Certificate in conflict with the coverage described in this provision will not apply.") The PDD Services provision states that "[c]overage is provided for the treatment of pervasive developmental disorders." The issue before this Court is whether the Defendant's decision that the prescribed vision therapy treatment for N.D.'s convergence insufficiency was not "for the treatment of" his PDD has rational support in the record. This inquiry has two components. The first concerns the Defendant's interpretation of the PDD Services provision. The second focuses on the Defendant's application of the provision to the circumstances of this case.

With respect to the first inquiry, the Court finds that the Defendant did not act arbitrarily and capriciously by requiring that services covered under the PDD provision be limited to those that are solely "for the treatment of pervasive developmental disorders." It was not unreasonable to demand that the treatment at issue be for the treatment of PDD, and not for some other ailment, even if they both contributed to the same symptoms. The sentence in the PDD Services provision that limited the type of treatment covered to that prescribed by the patient's doctor in

accordance with a treatment plan was a qualifier to the first sentence, which limited coverage to treatment of PDD. To the extent that the language of the PDD provision posed difficulties, reconciling them was the task entrusted to the Defendant. *See Frye v. Thompson Steel Co.*, 657 F.3d 488, 495 (7th Cir. 2011) (holding that even if the court might have concluded that the plaintiff's interpretation of the plan language was correct, "reconciling the conflicting provisions of the plan by dealing with the difficulties posed by its language is precisely the task entrusted to a plan administrator vested with interpretative discretion by the plan document"). Thus the fact that Dr. Luzzi prescribed vision therapy as treatment was not sufficient to trigger coverage under the PDD Services provision if the treatment was for the correction of a separate condition, and not for PDD.

The remaining inquiry, then, is whether the Defendant acted arbitrarily and capriciously when it determined that N.D.'s vision therapy was not for the treatment of his PDD. The Court finds that the Defendant has offered a reasoned explanation, based on the evidence, for its conclusion that the vision therapy was for the treatment of convergence insufficiency, and not for PDD. Although N.D.'s physician prescribed treatment for vision problems, and although N.D.'s eye problems contributed to some of the same difficulties with social interaction, attention, and concentration that he experienced because PDD, the Defendant's determination that his vision problems were the result of a condition that was separate and apart from his PDD is not devoid of reasoning or rational support in the record. The Defendant concluded that because the eye muscle coordination problem that N.D. experienced was a common childhood problem and was not specific to PDD, treatment of the condition was not treatment for PDD. Included in the Defendant's reasoning was the fact that the DSM-IVTR criteria for PDD did not

list vision disturbances. The Plaintiffs argue that the Defendant ignored Dr. Luzzi's statement that she included vision therapy in N.D.'s treatment plan as necessary to treat the core social deficits present as a result of the autism. They contend that because a qualitative impairment with social functioning is listed as a criteria for PDD in the DSM-IVTR, that the treatment of a vision condition that is a significant contributing factor to a child's social and attentional problems is treatment for PDD, even if vision problems are not explicitly listed in the criteria. Although this is one reasonable conclusion, the Defendant was not required to conclude that because N.D.'s vision problems contributed to the symptoms that he presented with the PDD, that the vision problems were caused by the PDD or were a part of the PDD diagnosis. As the Defendant's psychiatrist found during her clinical review, "there was no convincing documentation that [N.D.]'s convergence insufficiency was a part of his PDD," and "[c]hildren with PDD are likely to have other childhood illnesses, diseases, disorders, and problems as children without the diagnosis." (R. at 178, ECF No. 18-2 at 29.)[2] This decision was informed by the psychiatrist's conversation with Dr. Fortenbacher, and reviews of the medical record, the most recent DSM-IVTR, and an October 2008 press release from the National Institute of Health regarding the prevalence of convergence insufficiency. Likewise, nothing in the Certificate language required that the Defendant conclude that where treatment of a secondary problem

---

[2] The Court is aware that this sentence is incomplete as written. The psychiatrist may have intended to say that they are just as likely as other children, or simply to convey that they are both likely, even if the chances vary. There was certainly no evidence in the record before the Defendant that children with PDD were more likely to experience the common vision disorder at issue. The Defendant's reviewer did erroneously state that Dr. Fortenbacher's diagnosis was that PDD was secondary to the convergence insufficiency. Dr. Fortenbacher actually wrote that he diagnosed N.D. with a condition of convergence insufficient, secondary *to* PDD. (R. at 134, ECF No. 18-1 at 134 (emphasis added).) A review of the record as a whole does not convince the Court that this statement, had it been relayed correctly, would have changed the Defendant's conclusion regarding coverage.

would help with the treatment of a primary condition or with symptoms common to both, that the treatment be considered treatment of the primary condition. That Dr. Luzzi was observant enough to suspect that N.D. might have vision problems, and to recommend treatment for those problems if they were diagnosed, does not mean that the prescribed treatment was "for the treatment of pervasive developmental disorders," and the Defendant's conclusion to the contrary was not downright unreasonable. *See Carr v. Gates Health Care Plan*, 195 F.3d 292, 294 (7th Cir. 1999) (noting that it is not the reviewing court's function to decide whether it would reach the same conclusion as the administrator or even rely on the same authority, but is "only to determine if the decision was downright unreasonable").

In their closing paragraph, the Plaintiffs urge the Court to consider that the Defendant was operating under a conflict of interest when it made its decision to deny coverage. When an entity that administers a benefits plan, such as an employer or an insurance company, both pays benefits out of its own pocket and determines eligibility, the dual role creates a conflict of interest, and a reviewing court must consider that as a factor in determining whether the plan administrator abused his or her discretion in denying benefits. *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008). "[T]he significance of the factor will depend on the circumstances of the particular case." *Id.*; *see also Edwards*, 639 F.3d at 364 (noting that because a conflict of interest exists in almost every ERISA case, it is "not the existence of a conflict of interest . . . but the *gravity* of the conflict, as inferred from the circumstances that is critical") (ellipses in original) (quoting *Marrs v. Motorola, Inc.*, 577 F.3d 783, 789 (7th Cir. 2009)). The Court will determine the importance of this factor by looking to "the reasonableness of the procedures by which the plan administrator decided the claim, any safeguards the plan administrator has

erected to minimize the conflict of interest, and the terms of employment of the plan administrator's staff that decides benefit claims." *Majeski v. Metro. Life Ins. Co.*, 590 F.3d 478, 482 (7th Cir. 2009).

While it is true that the Defendant operates under this conflict, and that this conflict constitutes a factor in the Court's analysis, the Plaintiffs have presented no indicia of a decision-making process corrupted by this conflict of interest, such as a history of biased claim administration by the Defendant or an inappropriate set of incentives faced by the Defendant's employees tasked with reviewing claims. No rational finder of fact could find that the Defendant abused its discretion based on a conflict of interest because the Plaintiffs presented no evidence pertaining to the gravity of the conflict or any bias in the Defendant's claims administration or appeals procedures. Accordingly, the conflict of interest factor does not prevent the entry of summary judgment in favor of the Defendant.

## CONCLUSION

For the reasons stated above, the Court GRANTS the Defendant's Motion for Summary Judgment [ECF No. 17]. The Clerk will enter judgment in favor of the Defendant and against the Plaintiffs.

SO ORDERED on September 17, 2012.

 s/ Theresa L. Springmann  
THERESA L. SPRINGMANN  
UNITED STATES DISTRICT COURT  
FORT WAYNE DIVISION